IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. H-06-428 |
| | § | CIVIL ACTION NO. H-10-3796 |
| SYED MAAZ SHAH, | § | |
| | § | |
| Defendant-Movant | § | |

## MEMORANDUM AND RECOMMENDATION

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C. §2255 is Movant Syed Maaz Shah's §2255 Motion to Vacate, Set Aside or Correct Sentence (Document No. 129),[1] Memorandum in Support (Document No. 142), and the United States' Response to Movant's §2255 Motion (Document No. 134).   After reviewing Movant's §2255 Motion and Memorandum, the Government's Response, the record of the proceedings before the District Court in the underlying criminal case and on appeal, and the applicable case law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that Movant Syed Maaz Shah's §2255 Motion (Document No.  129) be DENIED.

I.      **Procedural History**

Movant Syed Maaz Shah ("Shah"), who is currently in the custody of the United States Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C. §2255.  This is Shah's

---

[1] Syed Maaz Shah's Motion to Vacate, Set Aside or Correct Sentence can be found at Document No. 1 in Civil Action H-10-3796 and at Document No.  129 in Criminal Action No. H-06-428.

first attempt at §2255 relief.

On April 11, 2007, Shah was charged by Superseding Indictment with possession of a firearm by an illegal alien in violation of 8 U.S.C. §§922(g)(5)(A) and 924(a)(2) (counts one and two), and with possession of a firearm by a non-immigrant alien in violation of 8 U.S.C. §§922(g)(5)(B) and 924(a)(2) (counts three and four).  (Document No.30).  On May 24, 2007, Shah was found guilty by jury verdict on counts three and four.[2] (Document No.84).

Prior to sentencing, a pre-sentence investigation report ("PSR") was prepared, to which Shah filed written objections.  (Document Nos.  93, 94, and 98).  Pursuant to the PSR, Shah's advisory guideline sentencing range was calculated as follows: (1) Shah had a base offense level of 14 under U.S.S.G. §2K1.2.  (2) With an offense level of 14, and a criminal history category of I, he had an advisory guideline sentencing range of 15 to 21 months.  On September 14, 2007, Shah was sentenced to a total term of imprisonment of 78 months, to be followed by a 3 year term of supervised release, and a special assessment of $200.00.  (Document No.  102, Transcript of Sentencing Hearing, Document No.108, pp. 47-50).  Judgment was entered on September 26, 2007. (Document No.106).   With respect to the length of Shah's sentence, and in particular the upward departure from the advisory guideline range, Judge Harmon stated:

> I heard all the evidence at the trial and which is something that those of us here did but not everybody in the audience or public did.  So, I think that it must be emphasized that my rulings and my sentence are based upon what I heard in the evidence and weighing the credibility of the witnesses as well as the presentence report and the Government's filings and the defendant's filings in objection to the report.

Pursuant to §5K2.0 and under §3553(a), the statute– the statute, I find that an upward

---

[2] The Government moved to dismiss counts one and two on May 23, 2007.  Judge Harmon granted the Government's oral motion.  (Document No.  76).

departure is warranted as the underlying conduct of the defendant was not fully captured under United States Sentencing Guidelines Section 2K2.1.

Under Chapter 3, the Chapter 3 adjustment under §3A1.4 was not applied because I do not believe that Mr. Shah's crime was an enumerated defense; but had it been applicable, there would have been a 12-level adjustment as well as a bump up in the criminal history category to a VI.

I do find that Mr. Shah's conduct was calculated to influence or affect the conduct of the Government by intimidation or coercion or to retaliate against the Government conduct and is a violation of §956(a)(1), which relates to conspiracy to murder, kidnap, or maim persons abroad, and §1114, which relates to killing or attempted killing of officers and employees of the United States.

So, in an effort to fashion an upward departure that would be appropriate and would also satisfy the sentencing objectives of §3553(a), I believe that it is appropriate for me to add 12 levels to the total offense level of ---

Mr. Cook: 16.

The Court: —16. I will not make any adjustments, obviously, to the criminal history category. But I will then, adding 12 points to the 16, would give a total offense level of 28, with which — with a criminal history category of 1, gives a guideline provision range of 78 to 97 months.

And I will say also that part of my upward departure is an effort to satisfy 18 United States Code, Section 3553(a)'s mandate that the Court is consider the deterrence of future crimes not only by the defendant himself but also by other members of the public. (Transcript of Sentencing Hearing, Document No. 108, pp. 47-49).

Shah appealed his conviction to the Fifth Circuit Court of Appeals. Unpersuaded by the arguments raised by Shah, the Fifth Circuit affirmed his conviction. (Document Nos. 126, 127). The Fifth Circuit wrote:

On two bases, Syed Maaz Shah challenges his conviction, by a jury, of possession of a firearm by an alien admitted to the United States under a non-immigrant visa, in violation of 18 U.S.C. §§922(g)(5)(B) and 924(a)(2). Shah also challenges his 78-month prison sentence. (The Government's motion to supplement the record with its original trail exhibits is GRANTED).

Following a lengthy FBI investigation, Shah was arrested on 28 November 2006 at

3

the University of Texas at Dallas, where he was a student. Shah, who testified that he was in the country on a non-immigrant student visa, admitted to the arresting law-enforcement officers that, *inter alia*, he had been participating in combat training in preparation for "jihad" against the United States.

At trial, the evidence showed that Shah had possessed an Armalite model M-15A4 semi-automatic rifle during two combat training sessions held at a camp in Willis, Texas. The jury found him guilty of violating 18 U.S.C. §§922(g)(5)(B) and 924(a)(2).

At sentencing, the district court concluded that Shah's underlying conduct warranted an upward departure. He was sentenced to 78 months imprisonment.

For the first of his two bases for challenging his conviction, Shah claims the district court erred by admitting in evidence his incriminating post-arrest statements. He maintains the Government failed to demonstrate that the statements were obtained in compliance with *Miranda v. Arizona*, 384 U.S. 436 (1966). We reject Shah's assertion that he preserved this issue for appeal through his motion to dismiss the indictment. Nevertheless, because the testimony at the hearing on Shah's motion to exclude the evidence clearly focused on whether Shah had voluntarily made the statements to the officers following the issuance of *Miranda* warnings, we conclude that Shah sufficiently preserved this issue for review.

Whether a defendant voluntarily waived his *Miranda* rights is a legal question, subject to *de novo* review. *E.g., United States v. Restrepo*, 994 F.2d 173, 183 (5th Cir. 1993). We must, however, "give credence to the credibility choices and findings of fact of the district court unless they are clearly erroneous." *Id*. The Government has the burden of proving, by a preponderance of the evidence: that the defendant voluntarily waived his rights; and that the statements he made were voluntary. *Id.*

The district court had before it the consistent and corroborative testimony of three officers that Shah did not request an attorney prior to making his incriminating statements. The district court's determination that the officers' testimony was credible, and that Shah's testimony was not credible, was not clearly erroneous. *See id.* Moreover, by stating its credibility determination on the record, the court complied with its obligations under Federal Rule of Criminal Procedure 12(d).

For his other challenge to his conviction, Shah asserts that the district court erred in denying his motion for judgment of acquittal. Shah's motion was based on the affirmative defense of entrapment. Among other things, an undercover agent participated in the training sessions. Shah maintains that person entrapped him. (The Government incorrectly asserts that Shah failed to renew his motion for a judgment

of acquittal at the close of the evidence.).

"When a jury, which was fully charged on entrapment, rejects the defendant's entrapment defense, the applicable standard of review is the same as that which applies to sufficiency of the evidence." *United States v. Rodriguez*, 43 F.3d 117, 126 (5th Cir. 1995). We must accept every fact in the light most favorable to the jury's guilty verdict, and we may reverse only if no rational juror could have found, beyond a reasonable doubt, either: (1) a lack of Government inducement; or (2) predisposition to commit the offense charged. *E.g., United States v. Reyes*, 239 F.3d 722, 739 (5th Cir. 2001).

Ample evidence permitted a rational juror to conclude that Shah was a willing participant in the training sessions, and, thus, that he was not entrapped into possessing a firearm. A defendant's ready and willing participation in Government solicited criminal activity is sufficient to prove predisposition. *Id.*

Shah's attempt to characterize his purported entrapment as falling within the "Bueno" defense is unavailing. "The principle of *Bueno* was rejected and the case effectively overruled by the Supreme Court in *Hampton v. United States*, 425 U.S. 484 [] (1976)." *United States v. Hill,* 626 F.2d 1301, 1306 (5th Cir. 1980); *see United States v. Bueno*, 447 F.2d 903 (5th Cir. 1971).

Shah's contention that he was not "positionally predisposed" to possess a firearm is, likewise, without merit. Even assuming, *arguendo*, that this court would recognize the positional predisposition concept, Shah has not established that no rational juror could have found that he could not have possessed a firearm without the Government's inducement. *See United States v. Ogle*, 328 F.3d 182, 188-89 (5th Cir. 2003); *see also United States v. Hollingsworth*, 27 F.3d 1196, 1200-03 (7th Cir. 1994) (because the defendants had "no prayer of becoming money launderers without the government's aid", they were not positionally predisposed to commit the offense).

Finally, Shah contends that his 78-month sentence should be vacated because the record fails to demonstrate that the district court was aware it could go below "the floor of the guidelines level in sentencing" him. Shah posits that, because he was sentenced prior to the decisions in *Gall v. United States*, 128 S.Ct. 558 (2007), and *Kimbrough v. United States*, 128 S.Ct. 558 (2007), the district court was unaware it had the discretion to sentence him below the sentencing range set forth under the advisory guidelines. Shah never apprised the district court of a constitutional claim regarding the court's procedure in assessing his sentence. Accordingly, this issue is reviewed only for plain error. *See United States v. Arnold*, 416 F.3d 349, 355 (5th Cir. 2005). His contention fails on the second prong of plain-error review: he fails to show a clear or obvious error.

In *Gall* and *Kimborough*, "the Supreme Court ... more explicitly set forth the permissible considerations in imposing a sentence, whether within or without an applicable Guidelines range." *United States v. Williams*, 517 F.3d 801, 809 (5th Cir. 2008).  Even prior to the decisions in *Gall* and *Kimbrough*, the Supreme Court had already recognized that a district court could impose a sentence that varied from the advisory guideline range based solely on policy considerations, including disagreements with the Guidelines.  *See Williams*, 517 F.3d at 809 (referencing *Rita v. United States*, 127 S.Ct. 2456 (2007); *see also United States v. Campos-Maldonado*, 531 F.3d 337, 339 (5th Cir. 2008) (noting that, in *Kimbrough*, "the Court reiterated what it had conveyed in *Rita*").  Because *Rita* was decided before Shah was sentenced, Shah's contention that the subsequent decisions in *Gall* and *Kimbrough* would have changed the district court's sentencing perspective is without merit.  Moreover, there is no indication in the record that the district court believed the advisory guidelines range should presumptively apply.  *See United States v. Cisneros-Gutierrez*, 517 F.3d 751, 766 (5th Cir. 2008).  As stated, Shah has not demonstrated clear or obvious error in the district court's imposition of his sentence.  *See Arnold*, 416 F.3d at 355.  (Document No. 126).

Shah petitioned the United States Supreme Court for review.  Shah's petition for a writ of certiorari was denied on October 5, 2009.  (Document No. 128).  Within one year of his conviction being final, on September 28, 2010, Shah signed his §2255 Motion, it was logged in as mail by the Federal Correctional Facility on September 29, 2010, and postmarked October 5, 2010.  Because Shah timely delivered his §2255 Motion to prison officials, it is deemed timely.  (Document No. 129).  A Memorandum in Support of Shah's §2255 Motion was subsequently filed, in which counsel briefed Shah's claims of ineffective assistance of trial counsel. (Document No. 142).

Shah raises claims of ineffective assistance of counsel, both at trial and on appeal.  According to Shah, his trial counsel was constitutionally ineffective in three areas: first, for failing to lodge objections to clearly inadmissible evidence; second, for failing to utilize available impeachment and/or exculpatory evidence; and third, for failing to argue relevant legal issues at sentencing.  Shah, also argues that appellate counsel was ineffective for failing to challenge trial counsel's ineffectiveness, failing to appeal the court's refusal to admit a statement by Jim Coates to Shah, and

failing to appeal the admission of evidence from Shah's computer.

The Government responds that Shah's allegations of ineffective assistance of trial or appellate counsel are without merit and that Shah's §2255 Motion to Vacate, Set Aside or Correct Sentence should be dismissed because Shah is not entitled to relief. According to the Government, Shah has not shown that his counsel was deficient nor has he shown he was prejudiced by the alleged errors. The Government has submitted the affidavit of Shah's counsel, in which counsel responds to the allegations in Shah's §2255 Motion. (Document No. 135). Counsel states in pertinent part:

> All of these matters were fact issues objections (sic) to which are governed by the Rules of Evidence. Affiant attempted to make the appropriate objections according to the Rules of Evidence. The specific reasons for objecting or not were based on the admissibility of the particular evidence, whether we could answer specific government testimony in the defense's case, and whether the testimony could more effectively be addressed on cross-examination. Also, some of the complained of testimony were simply collateral matters to the charges for which the defendant was on trial.
>
> Furthermore, affiant's recollection is that the term "jihad" was explained in detail by the defendant and on cross-examination. The term "jamaat" was similarly explored.
>
> The other allegations, ix., x., xi, apparently involved trial strategy.
>
> 2. These issues were totally explored in the defendant's case and in cross-examination.
>
> 3. This appears to be a swearing match where the defendant rebutted the testimony when he testified. Also this was explained on cross-examination.
>
> 4. This seems to be a complaint about style over substance. Affiant's recollection is that these issues were properly addressed at sentencing.
>
> The defendant's complaints appear to be a re-hash of the testimony and his review of how the case should have been argued. He mostly complains about argument in the case. (Document No. 135).

The background facts relevant to the instant action are set forth in the offense conduct section

of Shah's PSR.  (Document No. 98).  The PSR states in pertinent part:

6.  The FBI in a related case were investigating the activities of Kobie Diallo Williams and James Coates, both United States citizens, in July 2004.  It was determined that from June 29, 2004 to July 3, 2004, Williams and Coates camped at Big Bend National Park in Southwest Texas.  During this trip, Williams and Coates, dressed in Muslim attire and bearing firearms, were stopped by local law enforcement authorities.  The local authorities contacted the FBI about their contact with Williams and Coates.  In July 2004, the FBI opened a preliminary investigation.

7.  On July 9, 2004, FBI personnel attempted to interview Williams at his Houston residence and Williams advised he would not talk to agents unless he had his attorney present.  Williams' wife, Priscilla J. Williams urged Williams not to speak to the agents, and she slammed the door on the agents.

8.  In February of 2005, Coates approached the FBI concerning his association with Williams, Adnan Mirza and others.  At this initial meeting Coates told the FBI that in the presence of Mirza and Coates, Williams had announced that he planned to travel to Iraq to fight with the Mujahideen.  In light of Coates' statements, the case involving Williams was converted to a full-field investigation.

9.  On March 1, 2005, Coates agreed to consensually record his conversations with Williams and Mirza.  There were numerous consensually recorded conversations by Coates, with his dealings with Williams, Mirza, and others.

10.  According to Coates, he and Williams began discussing the best weapons for "urban warfare" in the spring of 2005.  Coates and Williams attempted to shoot at a shooting range on April 15, 2005, but the shooting range closed early.  Subsequently, Williams, Mirza and Coates decided to organize a weekend in May of 2005 for camping and firearms training at San Houston Park, north of Conroe, Texas.  They had several firearms training sessions, at various camping locations.

11.  At these camping/firearms training weekends, Williams, Mirza and Coates discussed sending money overseas to help the jihad and train in battlefield jihad.  Williams discussed ways to travel to Iraq, by stating he was going on behalf of a relief organization.  The group discussed travel papers, hotels, masjids (who might offer assistance) and the need to move cautiously.  Mirza noted that "they're monitoring everybody who comes in and out from the airports." Williams expressed his main concern, "is finding the right people."  The group focused on two locations, Iraq and Afghanistan.

12.  On June 4, 2005, Williams and Mirza met Coates and an undercover police officer (UC) at the American Shooting Center in Houston, Texas, to further train with

firearms.  Coates told Williams and Mirza that the UC, a Muslim, was an old friend with military experience who was willing to teach military tactics to the group.

13.  On January 13, 2006 through January 14, 2006, the over-night camping/firearms training weekend was conducted at "Camp Khalid Bin Waleed" in Willis, Texas (which was recorded).  Williams, Mirza, Coates, the UC and **Syed Maaz Shah (Shah)**, a citizen of Pakistan, [who] had come into the United States on an F-1 Student Visa issued in 2002, participated in the firearms training.  The next day, on January 14, 2006, the group after conducting their morning prayer, engaged in conversations as to their backgrounds, individuals they knew who associated with known terrorists or involved with terrorist organizations, their religion, and other general topics.  At one point, **Shah** showed the UC his passport and stated "[w]anna see what a terrorist passport looks like?"  **Shah** pointed to various country stamps on his passport to include Pakistan, United Arab Emirates, Oman, London, England, and the United States.

14.  During a consensually recorded conversation between Coates and Mirza on February 10, 2006, Mirza discussed the difficulties of entering into Pakistan given the current political climate.  Mirza went on to state that, "... as long as we are here" (in the United States) the men needed to give "them" as much financial support as "we can give them."  Based upon prior conversations with Mirza, Coates understood that Mirza was encouraging that they provide further financial support to the Mujahideen fighters and/or their families.

15.  Coates asked Mirza, "On the lines of planning, what do you suppose, (what) groups that we should target to get involved with over there?"  Mirza responded, "I think initially we should try to seek any assistance through Hanif Ismail.  Because Ayub, Ayub (Badat) mentioned that he knows groups who are into it.  Right...Over there."  When Coates asked, "Yeah?"  Mirza replied, "[a]nd ..., he even visited some."

16.  Coates continued to gather information from Mirza, asking, "[w]ell, see there's another thing, if Ayub (Badat) knows people in those groups ... are you talking about the Taliban groups?"  Mirza clarified his remarks regarding the groups working with Badat by stating, "No, not necessarily.  Other, other fighters.  Related (to the Taliban) but not directly.  But strong, strong groups."

17.  Coates told Mirza, "... we might not go in a jama'at.  you know what I mean?"  Mirza implied that the men would not be returning to the United States after they traveled overseas to engage in armed jihad.

18.  During a meeting consensually recorded by the UC on February 14, 2006, Mirza, Williams and Coates specifically discussed the route they would take to enter

Afghanistan.  Using the Internet while the UC was in the same room, the men viewed a map of Pakistan and identified and discussed staging areas/routes they would take to engage in battlefield jihad (although the term "battlefield jihad" was not explicitly used).  The group focused on locations northeast and southwest of Islamabad.

19.  The investigation continued as to the activities of Williams, Mirza and others.

20.  The investigation determined that **Shah** was recruited to join the group, and, Shah had participated in two of the groups's weekend firearms/defensive training sessions.  On January 14, 2006, during one of the weekend training sessions which was recorded, Shah stated to the UC, while brandishing his passport, "[w]anna see what a terrorist passport looks like?"

21.  Based upon investigation, there was insufficient evidence to connect **Shah** to the larger conspiracy, thus, he was charged with various gun violations.

22.  On November 30, 2006, **Shah** was arrested by FBI agents in Dallas, Texas, at his Richardson campus apartment.  **Shah** made a statement, according to the FBI 302, that he originally met Mirza through a community mosque, or through neighborhood contacts in Houston, Texas.  Their acquaintance originally occurred when Shah was in middle school, or the first part of high school.  **Shah** also advised that he frequently attends various mosques around the Houston area.  One of the main mosques that he is affiliated with is "El Farooq," formerly known as ISGH.  **Shah** related that while he has been in Richardson he attended the Richardson Mosque.

23.  **Shah** advised that he was very interested in weapons and had attended a firearms training camp, twice, with Williams, Mirza, Coates, and Malik Mohammad (UC).  They all referred to the training as "camping."  At this training, **Shah** advised that he fired an M-16 approximately ten times, an AR-15, M-4, and a shotgun.  **Shah** noted that when he fired the M-16 he only fired it in semi-automatic mode.

24.  According to **Shah**, the weapons were always brought to the training facility by Coates and Malik Mohammad.  **Shah** believed both of these individuals to be working for or cooperating with the FBI.

25.  **Shah** was questioned as to the real reason he was involved in firearms training, and hesitantly replied that he was participating in combat training in preparation for jihad.  When questioned as to why, **Shah** responded by saying that it was his obligation to fight oppressive and corrupt governments, such as the United States.  **Shah** went on to say that the killing of Muslims in Iraq by the United States was an example of his justification to participate in jihad against Americans.

26.  **Shah** was asked whether he had admitted to others during his training for jihad

10

that he was a terrorist.  **Shah** initially stated that he had not, then recanted and said that he may have said this as a joke.  When asked specifically if he (**Shah**) had held up his passport during one of the sessions for firearms training and made the statement, [t]his is the passport of a terrorist, **Shah** replied "maybe."

27.  **Shah** consented for his vehicle and apartment to be searched.  Agents seized **Shah's** computer which was subsequently analyzed.  The computer was found to contain multiple documents relating to Jihad, some which were from At-Tibyan Publications.   Among these documents was a document from Shaykh Abu Muhammad Al Maqdisi written from a prison, a letter from Shaykh Nasir al-Fahd from prison, a document by al-Imaam Ibn Nuhaas ad-Dimyaati with the title of "An advice to those who Abstain from Fighting in the Cause of Allah."  Other documents relating to conducting jihad were also found, one of which was from Sheik Omar Abdel Rahman, aka, "The Blind Sheik," implicated in the World Trade Center Bombing.  Other documents were titled "The Islamic Law of War," and "Treatment of Prisoner of War."  Also found in the computer were blogs from the At-tibyaan website written by **Shah**, where **Shah** added quotes from Abu Musab Az-Zarqawi, referring to jihad.

28.  **Shah's** computer contained digital photographs of buildings that were later identified as buildings in the Houston area and appeared to be taken from an elevated angle.  Other digital photographs depicted Shah and others in training and camping in a forest area with firearms.  There were several simulation games, such as "Counter Strike" which is a game in which terrorists fight counter-terrorism agents.  Another on-line game, which was identified as "Quest4Bush" which was a video game that prompts players to kill characters that look like President Bush.

29.  FBI investigated the Internet sites which had been accessed using **Shah's** computer which are videos, among them which were of "Al-Qaeda" related to attacks on American and Coalition Forces and "Al-Qaeda" propaganda relating to jihad.  (Document No.  98)(bold in original).

## II. Discussion

Claims of ineffective assistance of counsel are generally measured by the standard of *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, a petitioner must be able to show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could not be had.  *Strickland*, 466 U.S. at 687.  Deficiency is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is

reasonable. *Id*. at 687-88. The prejudice element requires a petitioner to prove that absent the disputed conduct of counsel, the outcome would have been both different and more favorable. *Id*. at 694-95. Under *Strickland*, a petitioner must establish both deficiency and prejudice prongs to be entitled to habeas relief. The failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *United States v. Seyfert*, 67 F.3d 544, 547 (5th Cir. 1995).

Under the deficiency prong of *Strickland*, judicial scrutiny of counsel's performance is "highly deferential" and "a strong presumption" is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy." *Wilkerson v. Collins*, 950 F.2d 1054, 1064-65 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993) (citing *Strickland*). To overcome the presumption of competence, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Under the prejudice prong of *Strickland,* a petitioner must be able to establish that absent his counsel's deficient performance, the result of his trial could have been different. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel. The determination of whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record. Each case is judged in light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense. *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied,* 467 U.S. 1220 (1984). The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct. *Strickland,* 466 U.S. at 690. "We will not find inadequate

12

representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices." *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999) (quoting *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)).  Conclusory allegations of ineffective assistance of counsel do not raise a constitutional question in a federal habeas petition. *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000), *cert. denied*, 531 U.S. 849 (2000) (citing *Barnard v. Collins,* 958 F.2d 634, 642 (5th Cir. 1992); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

The United States Supreme Court in *Harrington v. Richter*, ___U.S.___, 131 S.Ct. 770, 778 (2011) recently discussed *Strickland* in the context of a habeas proceeding involving a state conviction.  While *Harrington* did not involve a federal habeas proceeding involving a federal conviction, the Court's discussion of *Strickland* and ineffective assistance of counsel claims is instructive and equally applies to claims brought in a federal habeas proceeding such as those raised herein.

With respect to ineffective assistance of counsel claims, the Court observed that there are "'countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.'  Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Id.*  at 788-89 (quoting from *Strickland*, 466 U.S. at 689).   As a result, counsel's performance does not fall below that guaranteed by the Sixth Amendment where it can be shown that counsel formulated a strategy that was reasonable at the time and balanced limited resources with effective trial tactics and strategies. *Harrington*, 131 S.Ct.  at 789.  "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote

13

possibilities." *Harrington*, 131 S.Ct. at 791. Moreover, "it is difficult to establish ineffective assistance when counsel's *overall* performance indicates active and capable advocacy." *Harrington*, 131 S.Ct. at 791 (emphasis added). Finally, in considering the prejudice prong of *Strickland*, the likelihood of a different result must be substantial, not just conceivable. *Id.* at 791-792 (Citations omitted). As a result, "'[s]urmounting *Strickland's* high bar is never an easy task.'" (quoting from *Padilla v. Kentucky*, 559 U.S. ___, ___, 130 S.Ct. 1473, 1485 (2010)). The Court observed:

> Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.

*Harrington*, 131 S.Ct. at 778 (citations omitted).

As to the specific examples of ineffective assistance of trial counsel which Shah cites in support of his ineffectiveness of trial claims, such as that counsel could have and should have objected to clearly inadmissible evidence, failed to utilize available impeachment and/or exculpatory evidence, and failed to properly argue relevant legal issues at sentencing, the record either affirmatively shows that Shah's trial counsel was not deficient or there is no evidence that the alleged errors prejudiced Shah within the meaning of *Strickland*.

Shah suggests that counsel could have and should have objected to clearly inadmissible evidence and could have and should have utilized available impeachment and exculpatory evidence. Shah's counsel responded to Shah's §2255 Motion in an affidavit in which he stated in pertinent part, that his decisions were based on trial tactics and strategy. According to counsel, he weighed the following factors:

> All of these matters were fact issues objections to which are governed by the Rules of Evidence.  Affiant attempted to make the appropriate objections according to the Rules of Evidence.  The specific reasons for objecting or not were based on the admissibility of the particular evidence, whether we could answer specific government testimony in the defense's case, and whether the testimony could more effectively be addressed on cross-examination.  Also, some of the complained of testimony were simply collateral matters to the charges for which the defendant was on trial.  (Document No.  135).

Here, even assuming that counsel could have and should have made the objections as argued by Shah or more fully utilized available impeachment/exculpatory evidence, Shah has not shown that he was denied effective assistance of counsel.  Having reviewed Shah's allegations, in light of counsel's affidavit, in which he explained his strategy at trial as related to the specific errors raised by Shah, and the transcript of the trial, Shah has not overcome the presumption that counsel's decisions represented sound trial strategy. The record clearly shows that counsel was prepared for trial.  He was familiar with all of the exhibits, and engaged in thorough examinations of the witnesses.  While counsel may not have objected when Shah contends he could have or should have, the record, nonetheless shows that counsel responded in a manner consistent with his trial strategy.

Shah was charged with possession of a firearm by a non-immigrant.  His defense was that he was entrapped into possessing a firearm by the undercover agents and that he was not positionally predisposed to possess a firearm.  Counsel presented evidence that Shah intended to fish while at the camp, not shoot weapons.  Shah's ineffectiveness of trial counsel allegations suggest a disagreement with how his case could have or should have been argued. A court should not find inadequate representation merely because, with the benefit of hindsight, the court disagrees with counsel's strategic choices.  *Green v.  Johnson*, 116 F.3d 115, 1122 (5th Cir.  1997).  "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective

assistance of counsel unless it is so ill chose that it permeates the entire trial with obvious

unfairness." *Green,* 116 F.3d at 1122.   (quoting *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir.

1983)(on hearing).   As discussed below, the record corroborates counsel's sworn affidavit that his

decisions concerning when to object or the presentation of evidence were based on sound trial

tactics.

Shah also suggests that counsel could have and should have objected to clearly inadmissible

evidence.   Shah points to several exchanges which he claims show that counsel could have and

should have objected when the witnesses, none of which were qualified as experts under

Fed.R.Evid.702,[3] were allowed to offer testimony that required specialized knowledge or

alternatively, were allowed to offer opinions that were not based on their own perceptions and were

contrary to Fed.R.Evid.  701.[4]   According to Shah, both Malik Mohammed, the undercover agent,

and FBI Agent John McKinley should not have been allowed to offer their interpretation of the word

"jihad."  Shah claims that FBI agent McKinley testified that it meant "armed conflict" (Document

---

[3] Fed.R.Evid.  702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact
to understand the evidence or to determine a fact in issue, a witness qualified as an
expert by knowledge, skill, experience, training, or education, may testify thereto
in the form of an opinion or otherwise, if (1) the testimony is based upon
sufficient facts or data, (2) the testimony is the product of reliable principles and
methods, and (3) the witness has applied the principles and methods reliably to the
facts of the case.

[4] Fed.R.Evid 701 provides:
If the witness is not testifying as an expert, the witness' testimony in the form of
opinions or inferences is limited to those opinions or inferences which are (a)
rationally based on the perception of the witness, (b) helpful to a clear
understanding of the witness' testimony or the determination of a fact in issue,
and (c) not based on scientific, technical, or other specialized knowledge within
the scope of Rule 702.

No. 115, p. 153) and that Malik Mohammed testified that it meant "fight–we wanted to fight people that were oppressing, you know, Muslims." (Document No. 115, p. 191). Shah argues that testifying about the meaning of a term such as jihad required specialized knowledge. The Government responds that there were repeated references by witnesses including Shah to terms such as "jihad" and "jamaat." The Government further argues that counsel attempted to show that "jihad" has many meanings and that Shah was not predisposed to engage in armed conflict.

Here, the record shows that Agent McKinley testified that he was the case agent assigned to an investigation in 2004 involving Kobie Williams, James Coates and Adnan Mirza that was called Operation 8-Traq. (Document No. 115, p. 148-151). Agent McKinley testified that in the context of this case that "jihad" refered to armed combat. On cross examination, counsel questioned Agent McKinely about his expertise in defining "jihad." Agent McKinley testified that he was not fluent in Arabic, and acknowledged that the term "has many different meanings." (Document No. 115, p. 171). On re-direct, Agent McKinley clarified:

> Q. And why is it that in the context of what you heard, you believe the term "jihad" meant combat, armed combat?
>
> A. Because their discussions containing references to jihad or discussions about jihad were also within the context of what they were training for.
>
> Q. And what was that?
>
> A. To go overseas and engage US coalition forces in Afghanistan in combat operation. (Document No. 115, p. 174-175).

Again, the record shows that Agent McKinley testified on cross examination about his understanding of armed jihad:

> Q. Where did they say that they were going overseas and going to engage the United States in combat?

A.  Sir, I don't have a specific word-for-word example, but the context of the tapes, when you listen to them, it is clear.

Q.  As a matter of fact, they never say they are going overseas to engage the United States troops and coalition troops in combat, do they?

A.  Word for word, no.  (Document No.  115, p. 175).

Even assuming that counsel could have and should have objected to Agent McKinley's interpretation of the word "jihad", Shah has not and cannot show he was prejudiced within the meaning of *Strickland*.  Counsel's cross examination of Agent McKinley highlighted that the term "jihad" had multiple meanings.

Like Agent McKinley, Malik Mohammed was questioned about various terms used in the investigation.  As noted by Shah, he defined "jihad" as a fight.  In particular:

Q.  And then I use the term jaamat with this group of men, Kobie Williams, Adnan Mirza, the defendant, what does the word "jihad" mean to you?

A.  Jihad was basically, you know, fight— we wanted to fight people that were oppressing, you know, Muslims."  (Document No.  115, p.191).

Even assuming that counsel could have and should have objected when Malik Mohammed testified about the meaning of "jihad", the record shows that the definition was re-visited during counsel's cross examination of Malik Mohammed as follows:

Q.  And jihad, I believe you testified, jihad, according to your interpretation of it, meant to fight people who were oppressing Muslims, correct?

A.  Yes.

Q.  Well, to the best of your knowledge, there are a lot of people in the world who are oppressing Muslims, correct?

A.  Correct.  (Document No.  116, p. 306).

The record further shows that Shah was also questioned about what the term "armed jihad" meant to him:

> Q.  What does the term "jihad" mean to you?
>
> A.  It means striving.  Literally, that is the terminology.  In our religion it is used as striving for a good cause.  So that is what it is.  That is what the meaning is, and you can ask anybody that who is a Muslim, and that is the answer they are going to give you.
>
> Q.  All right.  Does it have different meanings depending on the context in which it is used?
>
> A.  Absolutely....(Document No.  117, p. 477).

Given counsel's cross-examination of Malik Mohammed and Agent McKinley, which established that jihad had many meanings, coupled with the direct examination of Shah about the meaning of 'jihad', Shah has not shown he was prejudiced within the meaning of *Strikland* by counsel's failure to object.

In addition, Shah contends that counsel was ineffective for failing to object when Malik Mohammed testified that Shah was not surprised there were weapons at the camp.  (Document No. 115, pp. 192, 200-201, 205-206).

> Q.  At any time did the defendant indicate any surprise to you, "oh, my gosh, a weapon.  What is it doing here?
>
> A.  No.  Not at all.
>
> Q.  Have you listened to all the recordings from Friday, January 13, 2006?
>
> A.  Yes.
>
> Q.  At any time on those recordings, did the defendant indicate surprise at seeing ammunition or weapons?
>
> A.  No.  (Document No.  115, p. 205-206).  *See also* (Document No.  116, p.  225-

226).

Again, the record shows that counsel cross-examined Malik Mohammend about his impression about

Shah's intent for visiting the campsite in Willis, Texas in January 2006.

> Q.  I'm not asking you for your opinion.  It is not my opinion we are talking about.
> I'm asking you, is there anything in any of those transcripts to reflect that Maaz Shah
> knew that ya'll were going to be doing any shooting on Saturday, January 14?
>
> A.  In the transcripts, no, but the fact that we were sitting there with the guns right
> there, yes.  (Document No.  116, p. 309).

> Shah next argues that counsel was ineffective for failing to object when Malik Mohammed

testified that Shah had described his passport as a "terrorist passport." (Document No.  116, p. 224,

225).  According to Shah, the question posed by the Government was formulated to seek specialized

knowledge from Malik Mohammed as a law enforcement officer that was involved in terrorism

investigations.  The record shows that Malik Mohammend testified as follows:

> A.  Yes.  And as the group stated, that is all the places that had activity, terrorist
> activity.  (Document No.  116, p.225).

Again, the record shows that counsel questioned Malik Mohammed about this conversation.

> Q.  All right.  And then there is some conversation about a terrorist passport.  You
> know from the context of that conversation and what happened there, everybody is
> laughing, everybody is having a good time.
>
> You know from the context of that conversation, don't you, Mr.  Mohammede, that
> was just purely a joke.
>
> A.  Quite possibly it could be a joke.  Yes.  I mean, he came up with that.  It wasn't
> elicited, so I don't know how he intended it.  (Document No.  116, p. 310).

The record further shows that counsel revisited the passport issue during his examination of Shah,

when Shah was given the opportunity to clarify the remark.  Shah testified that "that was merely a

20

joke...I decided to make a joke of it." (Document No. 117, p. 483 & 484).[5]   Even assuming that

counsel could have and should have objected to the testimony offered by Malik Mohammed about

the "terrorist passport," upon this record Shah has not shown he was prejudiced by the failure to

object on the ground that the Government was attempting to give more weight to Malik

Mohammed's testimony based on his role as in expert in international terrorism.

Shah also objects to counsel's failure to object when Malik Mohammed was improperly

asked what inference should be drawn about remarks concerning Shah's immigration status:

Q.  Was the Defendant's comment about his residency in the context of Dr.  Bayat
significant to you?

A.  Yes.

Q.  Why is that?

A.  Because its (sic) him stating that he realized his residency status — that he could
get in trouble coming out there shooting.  (Document No.  116, p. 254-255).

_____

[5] Shah's alleged statements about a "terrorist passport" also came out during Snow
Robertson's testimony.  With respect to Shah's passport, Snow Robertson, who interviewed Shah
following his arrest in Dallas, Texas, testified about Shah's alleged remark about his passport:

Q.  Did you ask the defendant at all about whether or not he had ever made a
comment regarding a passport of a terrorist?

A.  Yes, I did.

Q.  What can you tell me about that line of questioning?

A.  Initially, I asked him— I said, "Have you ever said that you are a terrorist?"
And initially he said no.  And then I went into further details about, "Did you ever
say–raise your passport up and say, "This is a passport of a terrorist  while you
were  conducting firearms training." And he said, "yeah, maybe."  (Document No.
117, p.  412).

According to Shah, counsel was ineffective for failing to object to this testimony because Shah had said nothing to Malik Mohammed about his immigration status.  The record shows that counsel timely objected to the testimony. (Document No.  116, p. 254)

Shah also contends that counsel was ineffective for failing to object to testimony offered by Snow Robertson, who testified that Shah told him that it was his desire to engage in jihad against the United States.  (Document No.  117, p. 417-419).  According to Shah, counsel should have moved to strike the improper and highly prejudicial testimony.  Snow Robertson testified that it was Shah's "obligation to train in firearms to be able to, how did he put it, be able to essentially conduct jihad against the United States because of— because of our actions in Iraq and it was his obligation." (Document No.  117, p. 411).  Counsel objected to the testimony on the ground that the statement was outside the scope agreed to at the Pretrial Conference.  In response, Judge Harmon advised counsel to take up the issue on cross examination.  The record shows that counsel cross- examined Snow Robertson about the statement.  (Document No.  117, p. 414).  In particular, counsel questioned Snow Robertson about the statement and the fact that the interview was conducted on November 28, 2006, no notes were taken contemporaneous with the interview, his report was written two days later, and makes no mention of the statement.  (Document No.  117, p. 414, 416, 418).  For example,

Q.  And is there anywhere in any report that you have generated that you can show us where that term "I want to kill Americans" is used?

A.  No.

* * *

A.  Right.  He said he had the obligation to conduct jihad against Americans and coalition forces, which is kill Americans.

22

Q.  That's your interpretation?

A.  Yes, Sir.  (Document No.  117, p. 418-419).

Given that counsel objected to the testimony, upon this record Shah has not shown that counsel's performance fell below that of *Strickland* by not moving to strike Snow Robertson's testimony.

In addition, the record further shows counsel questioned Shah about his remarks to Snow Robertson.  Again, Shah denied having told Snow Robertson that jihad meant going out and killing Americans, including soldiers (Document No.117, p. 477, 541).   In addition, in response to Government questioning, Shah challenged Snow Robertson's veracity.  (Document No. 117, p. 520, 541, 543, 544).  To the extent that Shah argues he was prejudiced by counsel's failure to object to the Prosecutor's questioning of Shah and specifically asking whether Snow Robertson was a liar, even assuming that counsel could have and should have objected to the line of questioning, Shah has not shown he was prejudiced given the jury was ultimately charged with assessing witness credibility.

Next, Shah argues that counsel was ineffective for failing to object to the evidence found on his laptop computer.  According to Shah, much of the information was highly prejudicial including a published letter from imprisoned Sheik Nasit al Fahd, a publically released letter from imprisoned Sheik Omar Abdel Rahman, an article entitled "All Desiring Jihad in the lands of the Arab Peninsula," reference to "An Advice for those who abstain from fighting in the cause of Allah", and photos of downtown Houston.  According to Shah, the presence of the five theoretical articles and letters on his laptop computer among over 1700 items hardly showed a predisposition towards acts of violence or possession of a firearm.

The record shows that Amy Trippel, an FBI agent assigned to the Computer Analysis

23

Response Team lab testified about the hard drive.  Counsel attempted to show that many people had access to Shah's lap top.  On cross examination, Agent Trippel testified that she could not tell when the actual material was generated and placed on the hard drive.  She further testified that she could not say whether Shah had generated any of the material on the hard drive or if he had viewed any of the material on the hard drive.  (Document No.  117, p. 363).  Likewise, Julie Vaughn, an intelligence analyst with the FBI testified about the material that had been taken off Shah's hard drive.  She testified that Shah had over 800,000 items and that she had book marked over 1,700 items.  (Document No.  117, p. 364-366).  She testified that she could not identify who placed the material on the computer.  (Document No.  117, p. 367, 369, 370, 376, 377, 379, 380, 381).  Counsel's effective cross examination corroborated Shah's claim that there were many people who had access to his computer besides him.

Next, Shah argues that counsel was ineffective for failing to object to the improper cross-examination by the Government of himself and his brother about his father's immigration status. The record shows that Shah's father's immigration status had been brought up earlier by the Government when Jessica Guilbeau, a senior special agent with the Department of Homeland Security, Immigration and Customs Enforcement, testified about Shah's visa status, which was related to his father's status.  She testified that Shah's earlier visa had been revoked because his father's visa had been revoked on national security grounds.  (Document No.  116, p. 338-339).  Shah argues that he was prejudiced by counsel's failure to object when both he and his brother were questioned about their father's status.  Both Shah and his 18 year old brother, Syed Irbuz Shah, testified about their father.  The Government responded by questioning them about their father, in particular, their knowledge of his immigration status in the United States.  The exchange between Shah's brother and

24

the Government follows:

> Q.  Are you aware that his visa had been revoked and he is not allowed back in the country, aren't you?
>
> A.  Yes.
>
> Q.  And, in fact, he has made numerous attempts to get back in the country and has been denied, correct?
>
> A.  Right.
>
> Q.  And the basis for that denial was his donations to Hamas, wasn't it.
>
> A.  No, I am not aware of any donations to Hamas.  (Document No.  117, p. 450).

Shah testified that his father resided in Nigeria.  (Document No.  117, p. 467).  The Government questioned him about his father's immigration status:

> Q.  In fact, your father has been revoked.  He can no longer return to the U.S.  Isn't that also true?
>
> A.  From my understanding, from the information I have received from my lawyer, which came from you, yes.
>
> Q.  Your father is not going to be allowed to return to the U.S., correct?
>
> A.  From the information I've received, yes.  (Document No.  117, p. 506).

To the extent that Shah argues that counsel could have and should have moved for a mistrial when the Government asked his brother whether their father had been denied entry into the United States, given that their father's immigration status had already been brought up during the Government's case in chief by Agent Jessica Guilbeau and given they had testified about their father, Shah has not shown counsel was ineffective for failing to move for a mistrial.

Shah further argues that counsel was ineffective for failing to object when the Government asked him about whether he knew that Kobie Williams had pleaded guilty to providing money to the

Taliban.  Again, the record belies Shah's argument that the prosecutor's questions were outside the scope of direct examination.  Shah testified that he had met Kobie Williams doing charity work, and that he was part of a "jaamat" with Kobie Williams, Adan Mirza, Jim Coates, and others to provide charitable services to the community.  (Document No. 117, p. 469).  Even assuming that counsel could have and should have objected, given that Shah testified about his association or "jaamat" with Williams, the Government was within bounds of cross examination to question Shah further about Williams.

With respect to Shah's allegations that counsel was constitutionally ineffective for failing to utilize available impeachment and/or exculpatory evidence, the record shows that counsel presented evidence showing that Shah intended to fish and that he was entrapped to attend the camp.  Counsel presented the testimony of Bilal Kathrada that Shah had gone to Walmart and purchased a fishing rod and supplies before Bilal Kathrada dropped Shah off at the camp in January 2006.  (Document No. 117, p.423, 425).  Shah also testified that he had bought fishing gear and equipment.  Malik Mohammend testified that Shah wanted to fish and that he in fact had gone fishing with Coates.  (Document No. 116, p. 300, 302, 306, 308, 309).  Additional evidence would have been cumulative.  Ultimately, it was the jury's province to compare the testimonies of the various witnesses and to decide who to believe.  The jury was instructed as follows:

> You are the sole judges of credibility or believability of each witness and the weight to be given the witnesses's testimony.  An important part of your job will be making judgments about the testimony of the witnesses who testified in this case.
>
> You should decide whether you believe what each person had to say and how important that testimony was.  In making that decision, I suggest you ask yourself a few questions: Did the person impress you as honest?  Did the witness have any particular reason not to tell the truth?  Did the witness have a personal interest in the outcome of the case?  Did the witness have any relationship with either the

government or the defense?  Did the witness seem to have a good memory?  Did the witness have the opportunity and ability to understand the questions clearly and to answer them directly?  Did the witnesses's testimony differ from the testimony of other witnesses?  These are a few of the considerations that will help you determine the accuracy of what each witness said.

Mr. Shah's testimony should be weighed and his credibility evaluated in the same way as that of any other witness.

During the trial you heard the testimony of Special Agent Gregory Alvarez who has expressed opinions concerning the operatability of the firearm charged in the indictment and the interstate travel of that firearm.  If scientific, technical or other specialized knowledge might assist the jury in understanding the evidence or in determining a fact in issue, a witness qualified by knowledge, skill, experience, training or education may testify and state an opinion concerning such matters.

Merely because such a witness has expressed an opinion does not mean, however, that you must accept this opinion.  You should judge such testimony like any other testimony.  You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's education and experience, the soundness of the reasons given for the opinion and all other evidence in the case.

In making up your mind and reaching a verdict, do not make any decisions simply because there were more witnesses on one side than on the other.  Do not reach a conclusion on a particular point just because there were more witnesses testifying for one side on that point.  Your job is to think about the testimony of each witness you have heard and to decide how much you believe of what each witness had to say.

The testimony of a witness may be discredited or impeached by showing that the witness testified falsely concerning a material matter or by evidence that at some other time the witness said or ddd something, or failed to say or do something, which is inconsistent with the testimony the witness gave at this trial.

Earlier statements of a witness were not admitted in evidence to prove that the contents of those statements are true.  You may consider the earlier statements only to determine whether you think they are consistent or inconsistent with the trial testimony of the witness and therefore whether they affect the credibility of that witness.

If you believe that any witness has been discredited in this manner, then it is your exclusive right to give the testimony of that witness whatever weight, if any, you think it deserves.  (Document No. 81, p. 4-5)

27

Shah also argues that counsel was ineffective in failing to present evidence at his sentencing hearing to refute the finding that Shah's conduct was designed to murder persons abroad and/or kill employees of the United States.  Shah suggests that counsel could have and should have relied on the trial transcript to refute this determination.

The transcript of the September 14, 2007, sentencing hearing refutes Shah's allegation that trial counsel failed to argue relevant legal issues at sentencing.  The record shows that counsel filed written objections to the PSR and argued the objections at the sentencing hearing.  Counsel successfully argued against increasing Shah's base offense level under U.S.S.G. §3A1.4, terrorist bump, and argued against the Government's request for an upward departure.  In addition, the record shows that Shah fully participated in the Sentencing Hearing.

Mr.  Jackson: All right.  I'll take the best stab I can.

I read through this and there's so much gross exaggeration and hyperbole here that it almost rises to the level of sophistry, the bastardization of the English language. I agree completely with Ms.  Monita in her analysis of this.  You've got to go down the laundry list, and all the notes and subnotes are just there to explain what the laundry list actually means.  None of these — no action of Mr.  Shah applies to this particular section.  I don't know how to make it — you know, I could – we could — we could torture this — the legal lexicon all day long here.

I don't think — but I think Ms.  Monita, who has done a thorough analysis of this, probably more so than any of us, came to the conclusion that none of those enumerated offenses relate to the conduct of the defendant.  And she comes to the base line conclusion that this particular upward adjustment of the calculation §3A1.4 does not apply to this case.

And a lot of reasons it doesn't apply is because, first of all, the Government is basing a lot of this — a lot of this rhetoric on what was said to Snow Robertson out here, a police officer who was on loan to the Terrorism Strike Force who — now, bear in mind, Your Honor, you have to keep this in some kind of historical context.  And the context is, is that, the last time what Maaz went to any kind of a camp or camping expedition where he was provided firearms, again, by the United States Government, was in March.  He wasn't — he didn't have this conversation with Snow Robertson

28

until November.  I believe that's when he had this conversation.

And this doesn't rise to the level of a confession.  It was not recorded.  These were just memory notes by Mr. Robertson, which he regurgitated in the courtroom.  The point is, Maaz never, in any conversations or anything else, ever indicated he was going to retaliate against the United States and kill soldiers.  They're talking about some — those so-called training exercises where he talks about "that's a kill, that's a head shot," that's that sort of thing.  He was doing that; he was play acting.  He was going along with the game that the Government had concocted for him to go along with.  So, that doesn't tell us anything.

He denies that he ever made those kind of conversations; and, if he did, it was in a philosophical, amusing– when he was just musing about things in philosophical conversation with Mr. Robertson.  He explained all that from the witness stand.  Now, if we're just going to disregard what he says and just swallow hook, line, and sinker everything Mr. Robertson says, then I'm just a potted plant here.  There's no reason for me to be in the courtroom.  But I don't think we've sunk to that level yet.

Ms. Monita has analyzed this.  She says they do not— in her opinion, they do not apply.  And I would suggest that to apply that type of upward adjustment in this case is just gross overkill.  I mean, it's just not that kind of case.  So, I would object to that vigorously.

The Court: All right.

Mr. Jackson: May the defendant say a word?

The Court: Certainly.

The Defendant: I'd like to refer to the evidence provided by the Government in exhibit– I don't know exactly the number– but in the exhibit, I clearly state that when a hypothetical scenario was brought up and someone mentions Chechnya, I immediately responded, "We aren't training to go overseas."  That's in the Government's own evidence in the trial.

Now, I ask you, if that's my recorded voice stating that, and here my confession is something else, I'm telling you that's not my confession.  That's not what I said.  There's no audio.  There's no signature on that.  Even Sgt. Snow Robertson, he admitted that, you know, it's coming all from his memory two days later.  No notes taken.

There's some clear discrepancies within that statement.  If you look at the end, it says that I had members in the Egyptian Muslim Brotherhood, members of my family,

relatives.  Your Honor, I'm Pakistani.  How in the world would I have relatives within the Muslim Brotherhood?

It states that I traveled to Pakistan for my dad's work.  That's not the case.  I went there to visit relatives.  My dad worked in the United States, he worked in U.A.E., he worked in Egypt, and he worked in Nigeria.  Before he came to the United States, he did work in Pakistan.  But that's not reason why I went.

I don't understand how the Court can take this confession, this four-page confession, from no notes, no audio, no signature, and take it as into evidence.  I ask you just look at the facts straight up, like it is, and the contradictory—it's contradicting to what the audio says within their recordings, within the Government's own exhibits at trial.  Those are not — that's not my statement.

Mr. Jackson: I'd just ask the Court to follow Ms. Monita's recommendation on this particular point and overrule that objection by the Government.

The Court: Anything you want to add?

Mr. Cook: No, Your Honor.  I believe you've heard the arguments and certainly read the paperwork supporting that.

The Court: All right.  I'm going to defer a ruling on this issue until we've heard the other objections.

Mr. Cook: That will be fine.

The Court: Okay.  Your other – you make the argument of an upward departure in the event that I overrule your objection.

Mr. Cook: That's correct.

The Court:  — to the bump.

Mr. Cook: And if we could argue that at the close?

The Court: Sure.  Yes, yes.

Mr. Cook: That's the appropriate time, Your Honor.

The Court: Okay.  All right.  All Right.  Then let's go to your objection, Mr. Jackson.

Mr.  Jackson: Are we just deferring the §5K2 request for an upward departure?

The Court: Yeah, we're going to defer that until the end.

Mr.  Jackson: Until the end.

The Court: Yeah.

Mr.  Jackson: My objections, Your Honor, are basically just what I got through arguing.

The Court: Well, let's just go these so I can either overrule them or not.

Mr. Jackson: This is so– this case is so global in nature.  And the Government — let me just say this, Your Honor.  The Government has thrown so much stuff in here in the sentencing part, that I even kind of get lost in this whole thing.

And, anyway, I just — I objected to– the probation department has already corrected Paragraph 65--

The Court: Right.  Right.

Mr.  Jackson:  — discrepancy.  There's no probation involved, I can see that.  So, then it just goes to--

The Court: Goes to--

Mr.  Jackson:  — Paragraph 77, 78, and 79, which deal with the departure.

The Court: Right.

Mr.  Jackson: I have– one of the things the probation officer said as far as – do you want me to argue these?

The Court: Yes, please.

Mr.  Jackson: One of the things that she said, that somehow or another tries to tie Maaz in with Kobie Williams and Adnan Mirza, you recall all this testimony about Kobie Williams and Mirza were people who were involved in this, that they had made contributions to the Taliban and somehow or another that translates into Maaz being involved.  There's absolutely no testimony anywhere that Maaz ever knew or participated in any way contributions to the Taliban or any other terrorist organization.

31

And there's just– we shouldn't just make some quantum leap here that he did just because there's some speculation or some– or now there's evidence linking Kobie and Mirza to activities at Willis – that were concocted by them anyway.  So, I don't think that's particularly fair.

And then, I think the essence of any kind of upward departure, when we're considering this, I still think we have to go back to– and I don't want to retry the case.  I'm not going to do that, Your Honor, or reargue it.  But I think we need to put this in its proper perspective.

Maaz Shah at the time was an 18-year old kid going out about his business at the University of Texas-Dallas where he was a scholarship– academic scholarship student.  He was busy at UTD making A's and he was coming to Houston to feed homeless people.  He was serving the community in those capacities when he was approached by a friend and invited to this trip to Willis, Texas.  There is not one shred of evidence that before that time Maaz Shah ever participated ever possessing a firearm or being involved in any kind of training whatsoever.

Then he goes to Willis, Texas, with a friend.  The friend testified in court that he bought fishing gear.  Maaz Shah, by every piece of testimony we've heard, was going to Willis, Texas, to fish and camp.  And then when he got to Willis, Texas, the Government operatives, who had gotten together before they ever went down there and concocted this scheme to try to get Maaz Shah and people like him involved in some kind of criminality so that we could be in a courtroom like today and try to get some kind of maximum-type sentence, I guess, in order to justify some kind of terrorist strike force activity– at any rate, he goes to Willis.

And then it's sprung on him at Willis that there's going to be some guns involved.  And all the testimony shows that.  There's no contradiction in that testimony.  He didn't know until he got there that there was going to be guns involved.  And the guns were brought to Willis by Government operatives.  They're the ones that provided it.  They're the ones that provided the so-called training exercises.  Maaz didn't go there with that intent.

So, until the day that the Government concocted this scheme— they got together before they ever went to Willis and concocted this scheme— Maaz Shah was going about his business as a very honorable, productive member of our society, not some Muslim society— and the Muslim society, the Muslim community.  He was serving them and doing what he was supposed to do.

Then the Government concocts this scheme and induces him, maybe not to the level of entrapment.  That may be cited somewhere down the line, but he was induced by the Government agents to handle those guns.  They gave him the guns.  They

provided the guns, and he went about training with the guns. Or they went about training him with the guns, the very thing that they say that they're trying to prevent, some kind of training by somebody who might be a threat to the United States. They're the ones that made him a threat, if anybody did. Okay. So, now, that was the trip. Then the next trip was March.

But on the first trip, you will recall, Your Honor, and, here again, I think it's very important for us to remember what actually took place and what was in his mind when he made these trips. On the first trip, remember the police came? Some sheriff department officials came to the site because they heard the guns. They checked Maaz's identification. They checked everybody else's identification. Unbeknownst to him, the FBI had contact them and said, "Look, don't interfere with our program. We got a deal going here, so don't interfere with it." But he didn't — Maaz didn't know that.

So, they checked his identification. It was indicated that the local police knew exactly what was going on there, and they said, "Okay. Here. You can go about shooting." And they left. So, what was that? Just practically, Your Honor, what impression is that supposed to leave on Maaz's mind? I'll tell you exactly the impression it was. He wasn't doing anything wrong.

So, he goes back after that trip in March thinking that what he was doing was legal. Now, they sat around the campfire and talked about all kind of things. But it was a philosophical conversation. They even bring up in here that he talked about the technology of cyberspace and whatever. Maaz is an engineering major. He's a technical person. So, he was just philosophizing about how those things should be done.

All right. So, he goes back in March, goes through this exercise. Still, remember, Your Honor, still, the guns and all the other activities were provided by the United States Federal Government's operatives. Maaz was an 18-year-old kid, an 18-year-old immature kid who was influenced to do these things by 30-some-odd-year-old Government agents who were sophisticated.

And remember this one thing, Your Honor. They had the agenda. He didn't. They had the agenda. That, to me, is mitigation of any kind of sentence he could be assessed. That is tremendous mitigation. And that overrides, I think, any kind of upward adjustment that the Court would contemplate, the fact that all this concocted by Maaz.

Then eight months later, after March, he has this interview with Snow Robertson where they say he made these inflammatory remarks. And then they throw in the fact that there was some things that were inflammatory off his computer that had

something to do with opposition to the United States Government's filibuster into Iraq.

Well, Your Honor, if the Government wants to make a criminal offense out of the millions and millions of us who oppose that incursion, then I guess we're just going to have to cordon off North Dakota and put all the prisoners in, because 75 percent of us don't agree with that. And that's probably what he was trying to reflect in some of those conversations. He didn't agree with that either. So, I don't know what we do about that.

And then, taking words and language out of context, out of all of this context, I think is grossly unfair. And contemplating an upward departure on that I think would be patently unfair under the circumstances. I think that the Court ought to apply the guidelines, which we've conceded the two-point upward departure for the number of firearms involved provided by – you know, if he's going to get two points upward departure, I suggest we give two points upward departure for the Government operatives who brought them out there. But we can't do that. They're immune.

So, what I'm saying is, Your Honor — and I don't want to ruin my own case by going too far. Please have patience with me on that. I don't want to do anything that would affect Maaz because this is his day in court.

But I think all those things taken into consideration, Your Honor, a two-point – or an upward departure from the guidelines calculated by Ms. Monita I think would be grossly unfair. I think within that range, the 21 to 27 months, would be, under any stretch of this imagination– of the imagination in this case, taking the context of the case, would be appropriate.

                            *                              *

Just an example of exaggerations by the Government, Ms. Hicks talks about the – that there was Al-Qaeda – the Al-Qaeda materials on Mr. Shah's computer. That was brought up in the presentence report on Paragraph 29. And in Paragraph 29, the probation officer says, "This sentence did not state the defendant used the word or term "Al-Qaeda." Rather, it's stated that the Internet sites the defendant had accessed on his computer included videos which were related to Al-Qaeda activities."

But it also goes on further to say, "This is an assessment of the investigating agencies." I submit to you that, in this particular case at least, and a lot of other cases I'm involved with, the assessment of the investigative agencies needs to be carefully scrutinized because I think it's been pretty well established that our investigative agencies sometimes are woefully, woefully wrong and inadequate. So, that's the assessment. Not something that actually said "Al-Qaeda." It's just that Al-Qaeda

activities was the assessment of the investigating agency.

We don't have any – we hardly have any way to fight that kind of thing. And to kind of put this Court on a guilt trip about, well, if we given him this, it's going to send a message to Americans that this, this –that's just patently unfair. I mean, what about the fact that the whole Muslim community is in support of him? What about the fact that he's – you got the letters. I'm sure you read the letters, stacks of them. We could probably have sent you 100 or 2 more, but your eyes would have probably glazed over by the time you got through those. So–and I could probably bring half the Muslim community in Houston to testify in his behalf.

So, to call Maaz Shah – it ought to just stick in their throats to call Maaz Shah a terrorist or some kind of person who wants to go out and kill Americans. That's just flat not even close to the truth. And I'm going to just — let me just read you one thing. I know we need to get to the end of this, but let me — if I would, I'd direct your attention to Government's Exhibit No. 11, in the very back of their objection. It has "Government's 11" on it. And it is — are you--

The Court: I got it.

Mr. Jackson: It's a Federal Bureau of Investigation 302, which is their summary of Kobie Williams' involvement in this. Kobie Williams — I'm not defending Kobie Williams. I mean, you know, whatever they say is true about him, then — but to put Maaz in the same category as Kobie Williams or any of the other defendants in this case is not appropriate, Your Honor. And let me tell you why.

Right now at the bottom it says, "Beginning in the summer of 2005, Williams, Coates, and Adnan Mirza began participating in camping trips to Willis, Texas, where they would also conduct firearms training." Then the next page, it says, "Malik Mohammad joined the group later in the year." Then it says, very clearly, 302, FBI writing down their – "These four individuals were described by Williams as the core," quote, "core group, hereinafter referred to as the 'core group' that participated in the firearms training sessions. Other individuals also participated in the camping and firearms session in an intermittent basis."

Then through that whole statement, you can go through page after page after page after page, Maaz Shah is mentioned one time. That's associated with a March 2006 incident. And all the way through, the FBI agent, in this summary of Kobie Williams' activities and the activities of the group, refers to the, quote, core group. Maaz Shah was totally peripheral to all of this. So, to throw the book at him would be patently unfair. He was a peripheral person in that particular — in those camping sessions. That's the FBI's own language. It talks about the core group. And then Maaz Shah, they throw him in there was somebody who intermittently we know

35

participated twice, and he quit.  Eight months later, they come to him and arrest him.

And then — Your Honor, I'm just — I'm going to ask Maaz to address the Court. I think this is so fundamentally important.  It's not – this doesn't necessarily rest on whether or not we send a message to the community about how we're going to treat people like Maaz Shah.  It sends a message to the community, and perhaps even the world, at how fair we're going to be in dealing with people within our borders.  And I don't believe – for me, personally, based on everything that we heard in this case, in putting it all in context, I don't believe for one minute that Maaz Shah ever had any predisposition to hurt anyone.  No one.  And to say otherwise is just twisting bits and pieces of conversation and out-of-context things.

And they talk about the transcripts of – that they attach.  If you'll go through those transcripts, Maaz Shah doesn't even say anything.  He just barely grunts a couple of times.   That conversation was being conducted and directed by Government operatives.  And you can call them– you can paint them any way you want to.  They were Government-trained, skilled operatives who were trained to infiltrate Muslim kids and try to induce them into this type of thing.

Maaz Shah would never, never have picked up a gun had they not been provided to him by Government operatives.  And, perhaps, Kobie Williams and the other person, Mirza.  But he wouldn't have done it, and I think that's something that the Court has to consider and mete out a fair and just sentence.  And if they think he's going to be an ongoing danger to the United States, then they're not being square with the Court on that because he's going to be deported.  He's on the next ship out, which is probably what should have happened to him to begin with, instead of going through this ten-million-dollar proposition trying to get one little old UTD student.

*      *

The Court: No, I haven't forgotten that we need to– I need to make some rulings on these objections.  That's very true.

I want to just go back — I want to just address the objections made by Mr. Jackson to the presentence report.  I believe that we've taken care of the objections in 65 and 66, which is a typo.  I believe that was objected to by the Government as well, and I think that's been taken care of.  So, we don't need to really address that one.

No. 71, I believe that's also been taken care of by just the addendum.

And then we have an objection to Paragraphs 77, 78, and 79, which talk about the factors that may warrant a departure.  And as these are just objections to the probation officer's talking about departure, basically, and so, as such, I'm going to

overrule the objections to 77, 78, and 79.

Then we have the supplemental objections in which the probation officer referred to Mr. Shah as undocumented, and I believe the probation officer has explained that, although at one time he did have an F-1 visa, he does not have an F-1 visa now and, therefore, is undocumented.

Then Paragraph 13, there is an objection to the passport comment about whether or not Mr. Shah said or what he said about his passport being typical of a terrorist, and that is — was a recording and, therefore, you know, anybody could hear what he said. Now, whether it was a joke or not is interpretation. So, I will overrule the observation to Paragraph 13.

Paragraph 20 is another objection to the passport comment and the camping/fishing comments, and I will overrule the objection to Paragraph 20.

And in Paragraph 25, the officer indicates that she could not locate this statement of,"Let's be realistic. We aren't going overseas." Can somebody point me to that?

Mr. Jackson: That's what he said.

The Defendant: That's ---

Mr. Jackson: That's one of the things Mr. Robertson failed to put in his report. That's what we're saying.

The Court: I understand that, but---

Mr. Jackson: He wouldn't put that in there.

The Court: I just would like to read it in the transcript. Anybody found that in the transcript for me?

Mr. Cook: No.

The Defendant: It---

Mr. Jackson: Mr. Shah, may he address the Court?

The Court: Surely.

The Defendant: It's in the Government exhibits that were presented in the trial. I don't have a copy with me right now because my only copy is with – it got left when

I moved out. It's in the Government exhibits within trial. And I wish I had it with me, but I do not have it. I have the rest of them, but I don't have that one specifically.

But it's in there. It's in the Government's exhibits. If there's some way I can get them, I would get them to you. And you can see it clearly that I state that. And if that isn't enough, then you can – if I was – if I'm allowed to force Kobie Williams and Adnan Mirza to come testify that that's what I said, then, you know, I can do that, too, if the Court would allow me.

The Court: Well, I'm just looking for it right now in these exhibits.

The Defendant: It's in the exhibits at trial, not in the objection report. So, I don't know.

The Court: Oh, exhibits at trial?

The Defendant: Right.

The Court: All right. I don't think it's really – it's important to you, but I don't think it's terribly important to the overall scheme of things, the overall case. And, so, whether or not it was said and not in the report, I don't know that it's – you know, because you concede you said that on the tape. I don't know whether it's there or not, but, you know, we'll just give you that–that.

All right. So, Paragraph 27, again, this is in the record. So, I'm going to overrule the objection to 27.

29, I believe we've already talked about this one. It's an explanation for what was meant there. You know, I think that's been taken care of by the probation officer in the addendum.

And then 53 is just a clarification again, also taken care of by the addendum.

And then 58, again, its just clarification that the probation officer did not take any – did not disagree with and doesn't impact the guidelines.

So, I think those are— have been taken care of and I don't need to make a ruling on those.

I believe I've taken care of all the objections of the defense, and all we have left is this question about whether to apply this 12 points for the terrorism. You know, I've gone back and forth on this, and I don't – I tend to agree with the probation officer

38

that these enumerated activities should be part of any kind of terrorism bump. So, I'm going to not apply the terrorism bump in this case and overrule your objection to that.

Now, that leaves us with the upward departure issue, and if anybody wants to make any other arguments concerning the upward departure issue before I make a ruling.

Mr. Jackson: Mr. Shah would like to address the Court.

The Court: All right. Mr. Shah.

The Defendant: Your Honor, at trial, you know, all the evidence that was shown was shown from one side of interpretation, not from my side and what I meant to say. And that's quite present. In fact, you know, I contradict some of the same allegations the Government alleges that I made within – within– within the own exhibits within the Government.

For example, one of them was about jihad in which I said openly, I said, "Flying planes into a building isn't jihad." Now, to associate me with a group of that nature, who claims that action as jihad, is totally off balance. It's in the Government's own exhibits. I didn't even display that at trial. The Government displayed that at trial.

They made it seem where it's like, oh, he talked about flying planes; but if you look at everything, if you read the whole thing, you'll see that I'm quite saying the opposite. You see during the same terrorist passport comment, it's like we're laughing. We're making a joke. I told the Court that, yes, I understand some people might take this to offense. That's quite understandable. It's like if women make jokes amongst themselves about men and a man comes to know about it, you know, he'll take it to offense. It's the surrounding environment.

Amongst Muslims, we can discuss some things and we understand what we mean. But if a third party comes in, they're not going to understand it. It's just within context. And there's so many things I can go over that were blown out of context. For example, the kill language. We're talking about silhouettes. In fact, in one case where they say I used "Kill, kill" over again, I said "I'm posing with my kill," it a tree that got shot down in the back and we took a picture of me holding the tree. Everything had to be within context, Your Honor.

A lot of conversations were around the general topic of jihad. I agree there were topics about that. I'm not denying that. But there was never anywhere to say that going overseas and killing Americans. There's nothing like that, not even anywhere. In fact, the one time where Chechnya was mentioned, I make it clear what my intentions are.

To me, as the Government agents within the audio pointed, they say, "Are you ready for some exercise, man?  He's going to make a man out of you, you know.  We're here chilling.  We're going to mess around in the woods."  They never used "training to go overseas."   The one time hypothetically it came up in my presence, I immediately claim what my position is, what my intent is.  I agree there's a huge misunderstanding of what jihad means.  Even in the audio recordings I mention that. A huge misunderstanding.

I explained in the court what my understanding of what it is, and the Government said, well, it does include – sometimes it includes fighting.  And I won't deny that. It does.  But everybody in this court knows throughout history there's been people who claim this in the name of God, this in the name of God, this – billions of people have died in that notion.  But is it really?  No.

In fact, I'll quote a tradition of the Prophet where it says: "A martyr is someone who defends himself, who defends his family, who defends his property, who defends his religion."  A defense, Your Honor.  Defense.  The Government is alleging I did — I'm going to go commit an offense overseas; I'm going to go over there to fight.  This is – that's my interpretation of what jihad means, and that's what all the discussions meant.

Obviously, in today's news and media and the Government, the word "jihad," the word "jihadist" is negative.  Even madrassa.  You look at madrassa.  Madrassa's literal interpretation is "school."  But in the media and everything, it's a negative connotation; they're an extremist school.  Jihad is a very positive thing.  It's very positive.  It's in the Quran.  It's in our holy book.  It says you can strive through charity.  You can strive with your inner lust to hold it back.  It's a struggle towards what's good.  And in defense, I mentioned it that, yeah, okay, maybe sometimes it does come out to fighting, no doubt; but it's always in defense.

The Government also alleged that Adnan invited me.  Who gave me directions, I'd like to ask the Court?  I'd like to ask the Government: Who gave me directions?  And the audio will show that Jim Coates gave me directions to Willis, Texas.  He was the one who provided me with directions.  They claim that I paid for ammunition, you know.  And they pick and choose from the audio.  Look at the audio carefully.  I ask when I'm paying with $30, I ask clearly, "what am I paying you for?  It better be worth it."  The response I get: "Oh, it will be.  Oh, it will be."  And the next day, when we're shooting, they said, This is what you paid for, the ammunition."

I only found that out later.  To my understanding, I'm just reimbursing them for the camp.  They are my friends.  Like I said, the reason I knew them was through civic activities.  Adnan invited me to come camping.  And if I had any power with me to bring him here in court, he'll testify to that.  Kobie Williams and him will testify that

I was in nowhere in any discussion or any conspiracy with them. They might have had those discussions on their own. Their intent might be something else.

Again, this court — it was also shown in this court Ilyas was brought, a 15-year-old kid, under the same pretext: We're going camping, we're going fishing. Not to mention other people used to come and go in these camps, too. There's like ten of them. There's ten people who did that. The only reason I'm in here and the only reason another person came here is because of the non-immigrant alien gun charge. That's it.

And you'll look in the evidence that before we ever went shooting, before we ever went shooting, I mentioned and suggest that we go fishing. Both times, the Government agent says, "No, we're about to get started." Another time, he said, "We're fishing for something." Well, you know, Your Honor, apparently I was fishing for trouble, and that's why I'm here.

And, you know, I can go on and break down every single little thing. If you have any questions of me, I can clarify it by what I meant and what it's in the real evidence. You know, I mean, I don't know how else to — what else am I going to say? This is – my intention to go there was to have fun. I agree, the second time I knew there would be guns. I'm not denying that. I'm not denying that, but the first time, I had legal conversations before we even went shooting and after we went shooting and the cops, Your Honor. And if that wasn't enough before the shooting where me and Malik had a conversation about the age legality – Malik is the undercover agent– and then afterwards we had a conversation in which he clearly states what we're doing here on private property is absolutely legit. He states that. This is all on the audio. We showed it in court.

And then the police come and the police clearly look at all our ID. Again, I'm just reiterating what happened. You know, and to emphasize that fishing was my priority, there's evidence that will show where I state in the audio that, "Next time, guys, you know, can we go camping near the sea so we can get fishing more?" Again, I don't know what else to tell this Court. I mean, it's just the Government is picking and choosing and interpretating  my comments in a certain manner to mean something else.

The "kill" comment, the conversation about the telecommunications, I can clarify that, too.  They asked me about what's my degree, and I said telecom communication.  And then Jim Coates, the undercover agent, federal agent, he said, "Oh, you're going to lay down some fiberoptic for Osama," you know, as he was joking. He said that. I said, "Hey, hey, you don't talk about that." I was in a serious context. Then he wanted to move into joking. He kept pushing. I said, "Look, you know, really, that's not the smart thing to do. This is the technically smartest thing

to do.  That would be the smartest thing to do."  I'm giving my professional opinion.  To blow it out of context to mean something that I'm actually going to go do that is absolutely absurd.

I don't want to waste the time of this Court, but I mean, it's mind boggling.  There's comments about pink camouflage and we were laughing.  Almost all the audio, you'll notice, we're laughing, we're laughing, we're laughing, we're laughing.  We're having a good time.  For me, this was a normal Texan activity.  And that's it.  That was it.

They went shooting out another time.  I decided not to join them because that was just not my thing.  My thing was more concentrated on fishing.  I agree I had fun.  I'm not denying that.  I agree I had fun.  We went into the woods.  We had fun.  You know, but it just was innocent fun to me.  That's it.  We were playing soldiers.  Boys will be boys.  I mean, you expect us to use rosy language?  I mean, this is just — I don't know what else to say.

And the entrapment charge, I understand that the jury said that it didn't– you know, it wasn't in my case, but I believe that they used a very subjective approach.  If you look at it from objectively, I asked about the legality before we even shoot the firearms with Malik.  And he says when you get 18 and you get handguns – and he's making me believe that it's okay.  Then we have another legal conversation.  Then he teaches me how to shoot the firearms.

In fact, in his own report, Your Honor, in his own report, he says, "Shah appeared to have little knowledge of the particulars of the weapons."  This is his own report, his own words.  And the Government is saying, "Oh, Shah had all this knowledge about weapons and whatever."  In his own report, he's saying that.  Yeah, I know some stuff from – about guns from games and movies.  We all see them, we all play them, you know, and we're not completely illiterate.  But the functioning and operating of firearms are completely a topic of the Government agents.  I showed pictures of that.

And like I said, I'll tell you this again, Mirza and Williams, they can come testify.  If I had some power to bring them here in court, they would tell you the truth on that matter.  But, like I said, their lawyers suggest that's not the way to go.  But if I could force them to come here and testify, they'd testify to that.  I understand they have cases and it's kind of sensitive for them so that's why they don't come here because their lawyers won't let them come here.  But they'll come.  I mean, I don't know how to bring them; but if you want more clarification, I'll bring them.

If you look at my previous record, Your Honor, all my record, I've lived here 15 years in the United States, from when I was in elementary school right up to high school.  Then I came back after going out of the country for a while to go to college.

This is all I know.  This is the country where I grew up.  I agree– you know, I don't agree with a lot of U.S. foreign policy.  Don't get me wrong.  I disagree with a lot.  I disagree with a lot.  But to suggest just because, you know, that some of these comments might be misinterpreted, that's exactly what they've been — that's happened.

If you look at the computer, they said they found some documents.  Your Honor, if I had a Communist manifesto, can you claim that I'm a Communist?  If I have a Bible, can you say I'm a Christian?  I have a Bible in my cell, Your Honor.  I read it, too.  And I believe that's the word of God, too, but I don't say I'm Christian.  The Government will try to — what the Government is trying to do is trying to assert that point just on the basis of opinions and articles.

I mean, if you look at my history, I got over a thousand hours of community service from Katrina  to, you know, helping feeding the homeless, you know, for years, which Mirza was the head in charge in Houston.  We had three Houston Chronicle articles on it.  Sheila Jackson Lee wrote a letter of recommendation on the basis of raising money to open a soup kitchen in the Third Ward.  I worked — the only one job I ever had was with a church-based religious organization that dealt with bereavement, called the Samaritan Ministry.  The only job I had, a Christian-based.  I help people regardless of nationality, race, or background.  That's just in my nature.  If you want to get me on something, that is my jihad, Your Honor.  That is my struggle to do good.

I give back to the community.  And I give it back, and I'm not bragging, you know, like I'm some type of like big-shot guy and I'm making everybody feel bad.  I'm just tell the truth.  If I'm helping Americans, there's proof of that.  Actions are more powerful than words, Your Honor.  I just found this group of like — this law that I didn't know.  No one informed me.  The Government didn't inform me when I came over here.  They never gave me a set of rules saying that this is what you need to follow.

At my orientation at the University, I was never informed.  In fact, I think the Government should really consider that this should be implied to all orientations for all non-immigrant aliens so they can tell people.  Because I can tell you there's probably a thousand or so out there going out to shooting ranges just shooting for fun, just like I did.  I went out and shot for fun.  And we don't know this is the law.

We look at the Bill of Rights.  It's says the Bill of Rights is for everybody.  It's for everybody.  The Second Amendment is in there.  That's what we're told.  We're told the Bill of Rights is for everybody.  You're protected under the Constitution.  And if you come into that pretext of that's all you know, like I said, I lived here 15 years.  I memorized that.  That's what I know, I mean.

If I had known that that was against the law, I would have done something for the law in order to obtain a firearm, if that was my intention. But, you know, I wouldn't have gone. I wouldn't have gone. I was under the pretext that there would be fishing. When I reached there, I fished, misled, possessed the firearms, police came, under the pretext that it's legal, come back a second time, and then I finally got set up, like I said, eight months, eight months. This core group did other activities during that time. They said they went to the shooting range after that camp. How come I didn't join them? I don't know what else to say. (Document No. 108, pp. 8-19, 26-45 )

In sum, the record controverts Shah's assertion that counsel was ineffective because he failed to argue against an upward departure. The record clearly shows that counsel vigorously argued against a terrorist bump and against an upward departure. Shah has not shown how the transcript from the trial would have made a difference to his sentence given that Judge Harmon reiterated that her rulings were based on the evidence, weighing the credibility of the witnesses, the PSR, and the filings by the Government and Shah's trial counsel.

Finally, in Shah's §2255 Motion, he raises several claims of ineffective assistance of appellate counsel. Shah argues that appellate counsel was ineffective for failing to appeal trial counsel's ineffectiveness, failing to appeal the court's refusal to admit a statement by Jim Coates to Shah, and failing to appeal the admission of evidence from Shah's computer.

The law is clear that a defendant has a constitutional right to effective assistance of counsel on direct appeal. *See Hughes v. Baker*, 203 F.3d 894, 895 (5th Cir. 2000). Claims of ineffective assistance of appellate counsel are generally assessed under the same two part *Strickland* deficiency and prejudice standard as claims of ineffective assistance of trial counsel. *United States v. Reinhart,* 357 F.3d 521, 525 (5th Cir. 2004); *United States v. Phillips*, 210 F.3d 345, 347 (5th Cir. 2000); *Roe v. Flores-Ortega*, 528 U.S. 470, 476-477 (2000) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999). With respect to *Strickland's*

deficiency prong, "[o]n appeal, effective assistance of counsel does not mean counsel who will raise every nonfrivolous ground of appeal available." *Green v. Johnson*, 160 F.3d 1029, 1043 (5th Cir. 1998), *cert. denied*, 525 U.S. 1174 (1999); *see also Ellis v. Lynaugh*, 873 F.2d 830, 840 (5th Cir.) ("The Constitution does not require appellate counsel to raise every nonfrivolous ground that might be pressed on appeal."), *cert. denied*, 493 U.S. 970 (1989). Rather, "a reasonable attorney has an obligation to research facts and law, or make an informed decision that certain avenues will not prove fruitful. Solid meritorious arguments based on directly controlling precedent should be disclosed and brought to the Court's attention." *Williamson*, 183 F.3d at 462-63. Simply put: "we must 'counter-factually determine the probable outcome on appeal had counsel raised the argument.'" *Reinhart,* 357 F.3d at 530 (quoting *Phillips*, 210 F.3d at 350).

As to the specific example of ineffective assistance of appellate counsel which Shah cites to in support of his ineffectiveness claim, the record either affirmatively shows that Shah's counsel was not deficient or there is no evidence that the alleged errors prejudiced Shah within the meaning of *Strickland*.

With respect to Shah's contention that appellate counsel should have raised on appeal trial counsel's ineffective assistance of counsel, generally such claims are not raised on direct appeal. *United States v. Bass*, 310 F.3d 321, 325 (5th Cir. 2002) (citing *United States v. Pierce*, 959 F.2d 1297, 1301 (5th Cir. 1992).

With respect to Shah's contention that counsel should have challenged his sentence, the record shows that appellate counsel appealed Shah's sentence and the Fifth Circuit affirmed his sentence.

As to Shah's claim that appellate counsel could have and should have challenged the Court's

admission of evidence about Sheik Omar Abdur-Rahman that had been discovered on his computer, Shah provides no specifics as to the legal basis that counsel could have and should have objected to the evidence.  Mere conclusory allegations of ineffectiveness are insufficient to support a claim. "Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue."*Green v. Johnson,* 160 F.3d 1029, 1042 (5th Cir. 1998)*, cert. denied*, 525 U.S. 1174 (1999).

Finally, as to Shah's contention that counsel should have appealed the court's refusal to admit a statement by James Coates to Shah, the record shows that the Court allowed counsel to offer evidence in the form of the transcript of the recorded conversation and counsel read it into the record:

> Q.  And you recall the conversation where it says, "I don't know.  Are the lights on?"  And then Malik Mohamed says, "No, they don't do that in the country anyway though.  It is private property though.  I mean, we can't"---
>
> And then Jim Coates says, "Randy."  And then Malik Mohamed says, "Yeah, it is possible.  It's private property.  We can shoot, so we are not doing anything wrong.  If it was public property, we would" — and then you're unintelligible.  And then there is a little bit more conversation there.  Do you recall that?
>
> A.  Yes, I do.
>
> Q.  Were you present when that conversation took place?
>
> A.  I was.  As you can see, there is a response to my statement.  (Document No. 117, p. 491).

Given that the statement was admitted, Shah has not shown that counsel was ineffective for not raising this issue on appeal.

In conclusion, because Shah has not shown that counsel's performance either at trial or on appeal amounted to incompetence under prevailing professional norms, all of his ineffective

assistance of counsel claims fail under *Strickland*.  "Counsel's overall performance indicates active and capable advocacy."  *Harrington*, 131 S.Ct.  at 791.

## III.  Conclusion and Recommendation

Based on the foregoing, it is

RECOMMENDED that Movant Syed Maaz Shah's §2255 Motion to Vacate, Set Aside or Correct Sentence (Document No.  129) be DENIED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within 14 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. §636(b)(1)(C), Fed.R.Civ.P. 72(b), and General Order 80-5, S.D. Texas.  Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc).  Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal.  *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996).

Signed at Houston, Texas, this 29th  day of March, 2012.

Frances H. Stacy
United States Magistrate Judge